BARRY J. PORTMAN
Federal Public Defender
GEOFFREY A. HANSEN
Chief Assistant Federal Public Defender
19th Floor Federal Building – Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant MARCHELOS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GEORGE MARCHELOS,<br><br>Defendant. | No. CR- 05 - 208 CRB<br><br>**GEORGE MARCHELOS'S<br>SENTENCING MEMORANDUM** |

This matter is set for sentencing on April 9, 2008. The defendant George Marchelos submits this sentencing memorandum to ask that he be sentenced to a term of home detention in lieu of jail as a consequence of both the extraordinary cooperation he provided the Government as well as his exceptional family circumstances.

Before these requests are addressed, Mr. Marchelos would like to recognize the difficult position this Court finds itself in with regard not only to the sentencing of Mr. Marchelos, but all of the defendants in this case. To be sure, the Government has argued throughout the time it has pursued this case that the E-Rate fraud at issue was a massive undertaking which involved the loss of hundreds of millions of dollars to the Government, and which deprived needy school districts of valuable technological services. In contrast, Judy Green and other codefendants have

SENTENCING MEMO                    1

argued that the Government never lost close to the amount of money which the Government claims it lost,[1] and that all of the schools which were identified as victims in this case obtained reliable state-of-the-art technological hardware which to this day provides their students with outstanding benefits.  Whatever the actual loss might be, and whatever may be the truth about the services which were eventually provided to the school districts at issue in this case, there appears to be no issue that the true architect of the entire fraud charged in this case was Judy Green, and that other individuals – corporate officers like William Holden and Earl Nelson, contractors/businessmen like Steve Newton, and salesmen like George Marchelos – all were involved in the fraudulent activities of Judy Green to a lesser and varying degree.  Just as importantly, there is no dispute that other individuals who were arguably equally involved in the fraud from the beginning – various corporate officers at VNCI and at some of the other corporations implicated in the E-Rate bid rigging – were never charged in the case at all.

What this Court faces then is the difficult task of sorting through each defendant's individual case – his or her activities in the E-Rate fraud, his or her background, his or her assistance to the Government – in a case which is so complex in many regards that it may well be impossible for this Court to evaluate the relative merit of the parties' arguments with respect to their individual roles in the E-Rate fraud implemented by Judy Green.  This is made all the more difficult by the fact that Judy Green went to trial before Judge Alsup, and therefore this Court did not have the benefit of hearing the evidence which the Government presented against her and the testimony given by the witnesses explaining Judy Green's actions *vis-a-vis* others involved in the scheme to defraud.

With all of this taken into consideration with respect to George Marchelos, there appears to be one important sentencing factor upon which everyone agrees, one which seems to be in

---

[1] At Judy Green's sentencing, the amount of loss was highly disputed.  Ultimately, Judge Alsup found the amount to be between 20 and 50 million dollars.  Mr. Marchelos agreed to a higher loss figure in his plea agreement, and is bound by that agreement.

SENTENCING MEMO                                2

some degree of dispute, and one which the Government has not weighed in upon as yet. The first is Mr. Marchelos's degree of cooperation; the second is his relative involvement in Judy Green's activities; and the third is his individual background.

**1. Mr. Marchelos's Cooperation**

Since the inception of this prosecution, the Government had one primary goal – to convict and punish the person it considered most responsible for the E-Rate fraud it has been investigating for the last decade. That person was Judy Green. And from the beginning of this case, Ms. Green has made it clear that she was never going to plead guilty, insofar as she never has believed that what she did was illegal or even inappropriate. Because Ms. Green knew the program as well as she did, and because the program and her relationships with the other players in the case were so complex, the Government needed someone credible and knowledgeable to put it all together and testify against her at trial. That person was George Marchelos. As the Government's sentencing memorandum indicates, Mr. Marchelos was invaluable in his cooperation in this case. During the many debriefing sessions he had with the Government, he explained exactly what Judy Green did and why she did it. It is undersigned counsel's opinion that the Government had some serious gaps in its understanding about what Ms. Green and others had done during the years that VNCI and others participated in the E-Rate program, and Mr. Marchelos filled those gaps and corrected some consequential misunderstandings about how Ms. Green operated. That cooperation obviously impressed the Government enough to use Mr. Marchelos as its star witness at her trial, where unlike some of the other witnesses he provided truthful, complete and accurate information about Ms. Green and everyone else involved in the case. In addition, he was uniquely able to provide the foundational testimony necessary to admit scores of documents which the Government needed to have introduced at trial. It is counsel's belief that Mr. Marchelos's assistance was critical to the Government's success in obtaining a conviction on all counts against Ms. Green, and it does not appear that the Government takes any issue with the fact that Mr. Marchelos provided substantial assistance far greater, and far more

SENTENCING MEMO                              3

1 valuable, than any of the other defendants who pled guilty and offered to assist the Government.

2 In short, Mr. Marchelos provided invaluable and extraordinary assistance to the Government, and

3 he deserves a substantial reduction in his sentence as a result.

**2. Mr. Marchelos's Role in the E-Rate Fraud**

Mr. Marchelos is now and always has been a salesman, pure and simple. He has never run a corporation or business, he has never held a corporate office of any consequence, and he has never been a person empowered to make serious decisions about any corporate policy or activity. Rather, he knows how to take a technical product like the VNCI switch, which was the focus of so much of this case, and sell it to potential buyers. What a salesman does of course is press the flesh and be the person who talks to potential buyers about the product , and in the process he or she oftentimes becomes the face of the company or entity selling the product. Thus, when people are later asked who they know at a company, or who they believe is the person responsible for getting them to buy a product, they refer to the salesman who they met.

In this case, George Marchelos's involvement in the E-Rate program entailed the sale of one product which evolved into the sale of a second. Specifically, Mr. Marchelos was hired by VNCI to sell its video switch, a product which by all accounts was a good, reliable and unique device which, as George learned from others including Judy Green, was potentially beneficial to school districts participating in the E-Rate program.[2]  However, in order to sell the switch, Mr.

---

[2] One of the truly tragic aspects of this case from the defendant's perspective is that the fraud at issue here involved hiding from the administrators of the E-Rate program the fact that the VNCI switch was included in the bids which were submitted. As Judge Alsup recognized at Judy Green's sentencing (and apparently considered as a mitigating circumstance), the VNCI switch in fact became eligible for E-Rate funding soon after Ms. Green submitted the false bids because it was a legitimate and valuable tool which served the goals of the E-Rate program:

> The Court: But its not clear to me that if they had asked honestly for the [VNCI switch] that it would have been denied. It might have been granted. In fact, a few months later the Government said it would be granted, and it was an okay item to ask for.
>
> Mr. Wood: Agreed.

SENTENCING MEMO                                4

Marchelos had to help sell the schools on two concepts: (1) the value of the E-Rate program; and (2) Judy Green's ability to get them E-Rate money. This was due to the fact that fairly early on Mr. Marchelos's supervisors at VNCI – which included both Robert Emory and Judy Green – felt that E-Rate was the program where the most money could be made for VNCI. Inherently, neither of George's sales functions was fraudulent or illegal; the VNCI switch was legitimate, and the E-Rate program was a worthwhile program whereby poor school districts could receive critical state-of-the-art technology which would bring their students into the 21st century. Crucially, unlike a fraudulent scheme where someone sells a product from the beginning which they know is bogus or which does not exist, Mr. Marchelos began his actions here with a clear conscience and with legal intentions; he hoped to sell his company's product to disadvantaged school districts which would benefit from its installation in their schools, and he hoped to get a commission for the sale of that product and thereby make a decent living.

As everyone now knows, this process was perverted and distorted by Judy Green in her efforts to personally enrich herself and the companies she dealt with. But as everyone who has been involved in this case for the last few years also knows as well, Judy Green exercised absolute and complete control over all the fraudulent activities she devised and administered. She never let others make any of the decisions about what was submitted by way of bids or which company won the bids, and she was the person who created the fraudulent and inflated figures which went to the E-Rate administrators. She truly was the head of the dragon, and no one else came close to having the responsibility, and culpability, for the fraud charged in this case.

Mr. Marchelos ultimately came to know that certain submissions to the E-Rate program were false, and he turned a blind eye to those actions because he wanted to continue to sell his product and support his family. But after this fraud was exposed, he was vilified as the person

---

Transcript of Judy Green's Sentencing at 29.

SENTENCING MEMO                                    5

who was closest to Judy and who was, after her, most responsible for the fraud charged. To put it simply, by being the salesman that he was, and by being the person whose face everyone saw at informational meetings and school board meetings, George became the personification of VNCI, and eventually, after Judy, the personification of the E-Rate fraud.

This last characterization of George Marchelos is simply wrong. Unlike the codefendant corporate officers in this case who would get corporate bonuses or huge salaries if their companies did well, George Marchelos never stood to individually benefit anywhere near as much as they did; he certainly hoped to make to substantial commissions on the sale of the E-Rate switch, but it was just that – sales commissions– which Mr. Marchelos was going to get.

George Marchelos was and is a salesman, and he was not Judy's right hand man in any substantive sense nor a person who helped orchestrate, devise or oversee the E-Rate fraud charged here. His culpability if anything is less than the other corporate officers, including Earl Nelson, who stand to be punished for the fraud here. All he asks is that the Court not fall prey to the false suggestion that Mr. Marchelos is even close in culpability to Judy Green, and that he deserves a greater punishment than do his codefendants. He asks only to be punished for what he is really responsible for having done, taking into consideration his individual circumstances, which are important.

**3. Personal Background**

Mr. Marchelos submits with this memorandum scores of letters from colleagues, friends and family members, all of which attest to the fact that he has lived a law-abiding life and has done his level best to make an honest living and take care of his family. (Exhibit A). But these letters mean much more. At prior sentencings in white collar cases, this Court has gone out of its way to express its feelings about sending out a message to the community about white collar crime. When a person like George Marchelos, who has never been in trouble before, pleads guilty and is forced to contact every person he has ever known to ask for a letter of recommendation, he is doing exactly that – telling the professional community to which George

Marchelos is associated that he has committed a violation of the law, and that he faces jail time and needs the help of his family, friends and colleagues. It is an incredibly humbling experience, and everyone knows it. Moreover, it seals George's professional fate, because by telling everyone he knows, and particularly his professional associates, that he is now a felon convicted of fraud, he cannot hide that fact from the world when he deals with anyone on a professional level in the future. Thus, through the shame which George experiences, the community is educated on a very personal level about the consequences of breaking the law, and the Court's desire to "spread the word" is accomplished at least to some extent.

Without repeating what is contained in the presentence report about Mr. Marchelos's background and the family he supports, it is noteworthy to highlight a few relevant facts. First, Mr. Marchelos never made huge amounts of money through his involvement in the E-Rate program. He certainly made commissions during the years at issue, but he never had a substantial income and lived a very modest lifestyle with his wife and five children. At the moment, he has no savings and no means of supporting his family if he is sent to prison for any extended period of time. As a result, he fears that his family could lose the house in which they live if he is sentenced to the sentence suggested as appropriate in the Government's sentencing memorandum.

Second, it should be emphasized that taking Mr. Marchelos out of the home for an extended amount of time could be disastrous on a personal level; his wife is an alcoholic and suffers from depression, two of his children have been diagnosed with Attention Deficit Disorder and have needed need special help at school, and a third child has severe learning disabilities resulting from processing difficulties. Mr. Marchelos alone provides his family with stability, and should he be out of the house in prison that stability will disappear. One of the letters attached to this memorandum is a letter from Mr. Marchelos's therapist, who he has been seeing for the last two years. As she notes, George has worked to honestly confront himself and the reasons for his actions, but has tremendous fears about what will happen to his family:

SENTENCING MEMO                                7

> My impression is that Mr. Marchelos has not attempted to avoid the pain involved is such a self-reckoning, nor that he expects to. He expresses a desire to take whatever responsibility is his to take, and to face up to the consequences which may arise. His biggest suffering appears tied to considerations of how the welfare of his large family could be impacted in serious and injurious ways, should his freedom and ability to work be forfeited. Meanwhile, he demonstrates unwavering commitment to supporting his family ... [and] to continue having a positive impact as father to his growing sons and daughters.

Letter of Monica Godfrey, attached.

In short, George Marchelos lives for his family, and they need his continued presence and support on every level. His family circumstances are exceptional, and merit special consideration by the Court.

**4. Conclusion**

The person most responsible for the E-Rate fraud charged in this indictment has been convicted and sentenced to over seven years in prison. This was a major accomplishment for the Government, and the sentence Ms. Green got was incredibly long for a white collar defendant. That does not mean that this Court should sentence Mr. Marchelos severely as well. Mr. Marchelos was among the first defendants to enter a plea, and was the person most responsible for helping the Government secure her conviction. It is counsel's position that Mr. Marchelos is less culpable than the corporate officer indicted in this case, because unlike them his job as a salesman and Judy Green's flunky never allowed him to make any of the substantive decisions they made regarding the fraud at issue here. But to the extent that this Court might find that his involvement was more than that of his codefendants, then so too was his cooperation, and thus again fairness dictates that he be treated less severely than they should be treated.

As noted above, the Court has said time and again that in its opinion, white collar defendants need to go to jail for some period of time so that other potential wrongdoers will get the message that white collar crime must end. But this Court has always considered the individual circumstances of each defendant it must sentence, and has already determined that Earl Nelson, a corporate individual whose company stood subject to making millions of dollars

SENTENCING MEMO                              8

for his E-rate activities, would be adequately punished if he was sentenced to home detention for a limited period of time. Mr. Marchelos asks for a similar sentence. Although Mr. Marchelos's health is not as fragile as is Mr. Nelson's, his family circumstances are much more compelling. More importantly, Mr. Marchelos provided substantially more assistance to the Government, and deserves substantially more consideration as a result.

    For all of these reason, Mr. Marchelos asks to be sentenced to probation for five years with the condition that he serve 12 months in home confinement.

Dated: April 2, 2008

                                       Respectfully submitted,

                                       BARRY J. PORTMAN
                                       Federal Public Defender

                                       /S/

                                       GEOFFREY A. HANSEN
                                       Chief Assistant Federal Public Defender